Filed 7/15/22  Mid-Wilshire Health Care Center v. Dr. Leevil CA4/3
Opinion following rehearing

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MID-WILSHIRE HEALTH CARE CENTER et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> DR. LEEVIL, LLC et al., <br><br> Defendants and Respondents. | G059097 <br><br> (Super. Ct. No. 30-2015-00801555) <br><br> O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Ronald L. Bauer, Judge.  Reversed and remanded with instructions.

Enestein Pham & Glass, Teri T. Pham and Matthew W. Rosene for Plaintiffs and Appellants.

Law Offices of Ronald Richards & Associates and Ronald N. Richards; Law Offices of Geoffrey Long and Geoffrey S. Long for Defendant and Respondent Dr. Leevil, LLC.

# INTRODUCTION

We granted a rehearing in this matter because we wanted to give additional consideration to the question of costs on appeal. Having done so, we conclude no changes are warranted. Mid-Wilshire Property, L.P. (Mid-Wilshire), and Mid-Wilshire Health Care Center, appeal from a judgment in favor of respondents Dr. Leevil, LLC (Dr. Leevil), and Lido Holding Company, LLC (Lido), entered after a proceeding bearing a passing resemblance to a trial took place in the superior court. This proceeding began in August 2017 and ended in November 2019. The two-year suspension was necessary because a core issue in the case – whether a late fee sought by Dr. Leevil was an unlawful penalty – was before a court in Ventura County. The record indicates that all parties and the court understood how crucial the resolution of this issue was, right up until the last day of trial in November 2019. Then it was ignored.

The case and this appeal concern the foreclosure sale of commercial property belonging to Mid-Wilshire, which had secured a loan eventually owned by Dr. Leevil. Mid-Wilshire and a related company, Westlake Village Property, L.P., both owed money to Dr. Leevil, and both defaulted on their loans. Dr. Leevil noticed trustee sales for Westlake's property in Thousand Oaks (Ventura County) and then for Mid-Wilshire's property in Tustin.

The trustee sale of the Thousand Oaks property produced a surplus of about $5 million over the Westlake debt, and $4.7 million of that amount was applied to the Mid-Wilshire debt. This is where the controversy begins. Dr. Leevil contended that some money was still owing on the Mid-Wilshire debt, and it proceeded to collect via non-judicial foreclosure on the Tustin property. Mid-Wilshire contended that applying the Thousand Oaks surplus wiped out its debt, and the foreclosure was therefore wrongful. Its lawsuit after foreclosure included Lido, the company that bought the Tustin property at the trustee's sale, with causes of action to set aside the sale and cancel the deed on sale.

2

The matter went back and forth between Ventura County and Orange County for several years, culminating in November 2019 in the two-day proceeding described above. This proceeding had some characteristics of a trial, in that it was held in a courtroom before a judge and counsel were present. There were also some stipulated facts and some exhibits admitted into evidence by agreement of the parties. But the similarity ends there, and we must reverse the judgment.

Unfortunately, we cannot construct the trial that should have taken place and then rule on it. We are not imbued with the power to do that. All we can do is send it back to the drawing board. But events that have transpired since the entry of judgment have greatly simplified the issues facing the trial court on remand. Mid-Wilshire has settled with Lido, so the causes of action in which Lido is an indispensable party will be dismissed. The cause of action for wrongful foreclosure, however, remains to be resolved, this time with the benefit of the Second District Court of Appeal's decision on the core issue mentioned above.

## FACTS

The facts recited here are taken in part from the amended stipulated facts filed in anticipation of the November 2019 portion of the trial and the exhibits admitted into evidence at the end of the proceeding.[1]

Two limited partnerships are involved: Mid-Wilshire and Westlake. Both limited partnerships owned commercial real estate, Mid-Wilshire in Tustin and Westlake in Thousand Oaks. Both limited partnerships borrowed money from TomatoBank, N.A., secured by a deed of trust on their respective real property. Both loans were extended from their original due dates to December 15, 2013, at which point both loans went into default.

---

[1] Exhibit 124 was omitted from the list of exhibits in evidence at the beginning of the reporter's transcript. It was, however, admitted into evidence.

3

In September 2013, before the defaults, Westlake agreed to place another trust deed on the Thousand Oaks property to secure Mid-Wilshire's debt. One of the facts stipulated for trial in November 2019 was that "[o]n September 16, 2013, [Westlake] executed a Collateral Surety Agreement and agreed to allow a second deed of trust on the [Thousand Oaks property] to secure [Mid-Wilshire's] obligations in connection with the Mid-Wilshire Note."

In April 2014, TomatoBank filed a suit for judicial foreclosure against Westlake and Mid-Wilshire in Ventura County Superior Court. The bank did not sue Mid-Wilshire in Orange County, but recorded a notice of default here in January 2014.

In July 2014, TomatoBank assigned all its interest in the Mid-Wilshire and Westlake notes and deeds of trust, including the second deed of trust on the Thousand Oaks property, to Dr. Leevil. In August, Dr. Leevil recorded a notice of trustee's sale for each of the two properties.

Both Mid-Wilshire and Westlake declared bankruptcy in September 2014. The bankruptcy court granted Dr. Leevil relief from stay, and it foreclosed on the Thousand Oaks property in February 2015 through a non-judicial foreclosure. Just before the foreclosure sale, Dr. Leevil assigned its interest in the *second* deed of trust on the Thousand Oaks property to D-Day Capital, LLC.[2]

The foreclosure sale resulted in a surplus of over $5 million. Of that amount, the foreclosure trustee paid D-Day $4.7 million; the remainder, $604,000, went to Westlake. The amount paid to D-Day was applied to the Mid-Wilshire debt.

---

[2]     Dr. Leevil's manager, who was also its lead counsel at trial, asserted that this expedient was made necessary by the rule prevailing at the time that a lender could not collect a judgment on a second trust deed if it was also the lender on the first trust deed. A different entity would be assigned an amount of the debt equal to the anticipated shortfall; this entity could then sue for the difference. As it turned out, however, the sale of the Westlake property resulted in a hefty surplus, so the assignment to D-Day was unnecessary.

The rule changed with the Supreme Court's opinion in *Black Sky Capital, LLC v. Cobb* (2019) 7 Cal.5th 156. The court held that the anti-deficiency statute, Civil Code section 580d, did not prevent a sold-out junior lienor from suing to collect its debt after a non-judicial foreclosure, even if the junior and the senior lienors were the same entity, provided that there was no evidence of loan-splitting and gamesmanship. (*Id.* at p. 165.)

Mid-Wilshire's bankruptcy was dismissed in July 2015, and Dr. Leevil promptly posted a notice of trustee's sale on the Tustin property. The property was sold to Lido for $1 million on July 22, 2015.

Mid-Wilshire and its tenant, Mid-Wilshire Health Care Center, sued Dr. Leevil and Lido in Orange County Superior Court on July 28, 2015. They asked to set aside the trustee's sale and cancel the trustee's deed; they also asked for quiet title and an accounting and sued for wrongful foreclosure. A first amended complaint was filed in August. The basis for the lawsuit was that the debt secured by the Tustin property had been fully satisfied by the surplus from the sale of the Thousand Oaks property, which had been applied to retire the Mid-Wilshire debt, and therefore Dr. Leevil had no right to foreclose on the property in Tustin.

In the meantime, the suit for *judicial* foreclosure against Westlake had been proceeding in Ventura Superior Court. Dr. Leevil filed a motion for summary judgment in January of 2015 and a supplemental memorandum of points and authorities in April. The court denied the motion in May 2015, but by that time the non-judicial foreclosure on the Thousand Oaks property had already taken place, and the property had been sold for $15 million. The Ventura action was set for trial.

In May 2017, the Orange County court granted Dr. Leevil's motion to bifurcate the equitable causes of action – set-aside, cancelation of deed, quiet title – and trial commenced in August 2017. On the first day of that proceeding, Mid-Wilshire gave the court a summary of the amounts involved in both the Mid-Wilshire and the Westlake debts, which summary the court called "above and beyond" what it had asked for. This summary showed categories of charges that were both disputed and undisputed. The disputed categories included certain interest calculations and attorney fees. By far the largest single disputed amounts, however, were two maturity late fees – $410,999 for Westlake and $194,649 for Mid-Wilshire – that were included in the debt for each limited partnership.

5

The propriety of the maturity late fee as part of the Mid-Wilshire debt was one of the issues before the Orange County court in August 2017. The court was aware that the late fee was also an issue in the Ventura lawsuit. The court "invited" the parties to submit the late fee issue to the Ventura court, and the Orange County trial was put over to await the decision from Ventura.

In Ventura, Dr. Leevil filed an amended complaint that included a declaratory relief cause of action asking for a decision as to the validity of the late fees. In November 2018, the Ventura court held on summary adjudication that the late fee on the Westlake note was improperly imposed and was, in any event, an unlawful penalty. In February 2019, the court made the same ruling with respect to the late fee on the Mid-Wilshire note. Dr. Leevil appealed. The Second District Court of Appeal affirmed the trial court's ruling as to both Westlake and Mid-Wilshire, ruling that the late fee was an unlawful penalty. The unpublished opinion was filed on July 16, 2020.[3]

While the appeal was pending, the bench trial in Orange County on Mid-Wilshire's complaint resumed in November 2019. Although the existence of the debt was discussed, the main emphasis at this portion of trial was whether the correct procedure for noticing and conducting a non-judicial foreclosure sale had been observed and whether Lido was a bona fide purchaser. If the procedure was correct and Lido was a bona fide purchaser, the sale could not be unwound.

The bench trial proceeded on November 19 and 20, 2019. The parties spent the first day of trial assembling a list of stipulated facts, which they presented to the court the next day. During the second day, no witnesses took the stand; the time was spent by

---

[3]     Dr. Leevil petitioned the Supreme Court for review in August 2020. The petition was denied in September.

Appellants have requested judicial notice of various documents relating to the appeal and the petition for review. We grant the request with the caveat that we can take judicial notice only of the existence of the briefs filed by the parties to the appeal, not the truth of any statement made in the briefs. We may take judicial notice of the outcome of the appeal, the existence of the petition to the Supreme Court, and the notice denying the petition for review. (See *Lindsey v. Conteh* (2017) 9 Cal.App.5th 1296, 1302, fn. 2; *Day v. Sharp* (1975) 50 Cal.App.3d 904, 914.)

counsel arguing, telling stories, impugning each others' motives, and presenting unsworn narratives about what had happened over the four-plus years since the sale of the Thousand Oaks property in February 2015. At the close of the second and last day, 15 exhibits were admitted into evidence. The trial court opined that "my friends around the corner," meaning this court, "will help you better than I did."[4]

The trial court issued its statement of decision on February 26, 2020. It ruled in favor of the defendants on all the equitable issues – trustee sale set-aside, cancelation of trustee's deed, quiet title – and ruled that the legal issue, wrongful foreclosure, was moot. Judgment in defendant's favor was entered on the same day. Mid-Wilshire filed a notice of appeal on May 26, 2020.

But the story does not end there. In June 2020, Mid-Wilshire abandoned the appeal against Lido, the company that purchased the Tustin property at the trustee's sale, stating these parties had settled. As a result, Dr. Leevil filed a motion to dismiss the appeal on several grounds.

In September 2020, Dr. Leevil exhausted all possible appeals of the Ventura court's ruling regarding the maturity late fee. The opinion of the Second District Court of Appeal – that the late fee was an unlawful penalty – was not addressed.

**DISCUSSION**

Mid-Wilshire has identified four issues on appeal. Two of them relate to whether a debt still existed at the time of the Tustin property foreclosure sale, or whether Dr. Leevil had been fully paid off by that time. A third issue is whether Dr. Leevil had standing to foreclose, or whether it had assigned all its rights to D-Day before foreclosure. Finally, Mid-Wilshire argues that the court should have permitted a jury trial on its wrongful foreclosure cause of action and did not allow it to put on its case during the bench trial.

---

[4] Judge Bauer's work rarely needed our help. This is an exception.

The elements of a tort cause of action for wrongful foreclosure are: "'(1) the trustee or mortgagee caused an illegal, fraudulent, or willfully oppressive sale of real property pursuant to a power of sale in a mortgage or deed of trust; (2) the party attacking the sale . . . was prejudiced or harmed; and (3) in cases where the trustor or mortgagor challenges the sale, the trustor or mortgagor tendered the amount of the secured indebtedness or was excused from tendering.' [Citation.]" (*Miles v. Deutsche Bank National Trust Co.* (2015) 236 Cal.App.4th 394, 408 (*Miles*).) An exception to the tender requirement exists when the borrower challenges the validity of the debt. (*Lona v. Citibank, N.A.* (2011) 202 Cal.App.4th 89, 112-113.) An action for wrongful foreclosure will lie if at the time of the foreclosure no failure of performance existed. (*Miles, supra,* 236 Cal.App.4th at pp. 408-409.) The measure of damages, as in all tort claims, is all proximately caused damages. (*Id.* at p. 409.)

Looming over this appeal is the nature of the proceeding that started in August 2017, was suspended, and then concluded in November 2019. This was referred to as a trial, but there were no witnesses, and there was a metric ton of extraneous matter. In November 2019, the parties submitted a list of stipulated facts, and these, along with the 15 exhibits admitted into evidence without objection, made up the evidence before the court.

We are, of course, in favor of stipulated facts and exhibits. But they can go only so far. While the parties can agree on background facts – in this case, for example, the notes, the deeds of trust, and the defaults – they are not likely to stipulate to the disputed issues that the court needs to decide. If they could, they would not be in court. And we would not be searching here for information.

For purposes of this appeal, we have concentrated on the evidence supporting the trial court's resolution of two issues. First, did Dr. Leevil have standing to foreclose on the Mid-Wilshire property, in light of its assignment of the second trust deed

on the Westlake property to D-Day?  Second, was there a debt to foreclose upon, or had it been paid off from the surplus on the Westlake foreclosure?

**I.        Standing**

Stipulated fact No. 35 asserted, "On February 17, 2015, an assignment of the Westlake 2nd D[eed] O[f] T[rust] was recorded . . . in Ventura County, CA.  (Exh. 017-01)"  The court made the following corresponding findings of fact in the statement of decision: "35.  On February 17, 2015, an assignment of the Westlake 2nd D[eed] O[f] T[rust] was recorded in . . . Ventura County, CA, wherein Dr. Leevil, LLC, assigned the Westlake 2nd D[eed] O[f] T[rust] to D-Day Capital, LLC.  [Exh. 017-01; Stipulated Fact No. 35; Trial Transcript ("TT") 16:20-17.16][5]  Along with that assignment of the Westlake 2nd D[eed] O[f] T[rust], Dr. Leevil, LLC made to D-Day Capital, LLC a limited and circumscribed oral assignment of the right to payment on the Mid-Wilshire Note only up to the amount which was secured by the Westlake 2nd D[eed] O[f] T[rust] as based upon the claim that was paid and allowed by the foreclosure trustee.  [Exh. 017-01; TT 122:20-123:25]  [¶] 36.  Dr. Leevil, LLC remained as the holder and payee of the Mid-Wilshire Note to the extent that any amounts were due and owing thereunder were not allowed and paid by the foreclosure trustee from the foreclosure sale of the Westlake Property. [Exh. 017-01; TT 122:20-123:25]."

Exhibit 17 is the one-page assignment of the second deed of trust by Dr. Leevil to D-Day, recorded on February 17, 2015.  Nothing in this document mentions a partial oral assignment to D-Day of any amounts.  Moreover, the fact that the trustee of the Westlake foreclosure sale paid a certain sum of money (which was stipulated) to D-

---

5        The references to the trial transcript are meaningless to us.  The page numbering of the reporter's transcripts altered completely when the record was prepared for appeal.  In any event, if the reference is to the proceeding that took place on November 20, 2019, it could not have been a reference to sworn testimony; there wasn't any.

The first 19 items in the findings of fact portion of the statement of decision frequently cited to exhibits that were not admitted into evidence.

9

Day out of the foreclosure surplus does not establish that Dr. Leevil remained the holder and payee of the Mid-Wilshire note.

One of the exhibits admitted at trial, exhibit 18, was a declaration from Ronald Richards, who wore at least two hats. He was at once the managing director of Dr. Leevil, and lead counsel for Dr. Leevil during the Orange County trial. It was suggested that he was also the managing director of D-Day, the assignee of the Westlake second trust deed. His declaration (which became exhibit 18) had been filed in connection with earlier cross-motions for summary judgment. Dr. Leevil's summary judgment motion was denied because Mid-Wilshire had carried its burden to establish a triable issue of fact as to "what amount, if any, was still owed to Dr. Leevil after distribution of the surplus proceeds from the Westlake property sale was made to D-Day . . . ."

The purpose of the Richards declaration was never discussed during the November proceeding, and it is unclear to us how it was supposed to be regarded. If it was intended merely to show that Richards had filed a declaration, its relevance to the issues before the court at trial is, at best, questionable. Any statement made in the declaration itself would be hearsay or legal conclusion. If it was intended to be testimony from a percipient witness – in other words, if the court was supposed to regard the statements made in it as true – then an opportunity for cross-examination was required.[6] (See *In re Marriage of Swain* (2018) 21 Cal.App.5th 830, 841-842.) Although Mid-

---

[6] "Cross-examination of a witness is a matter of right. [Citation.] Its permissible purposes, among others, are . . . that facts may be brought out tending to discredit the witness by showing that his testimony in chief was untrue or biased. [Citations.] [¶] Counsel often cannot know in advance what pertinent facts may be elicited on cross-examination. For that reason it is necessarily exploratory; and the rule that the examiner must indicate the purpose of his inquiry does not, in general, apply. [Citations.] It is the essence of a fair trial that reasonable latitude be given the cross-examiner, even though he is unable to state to the court what facts a reasonable cross-examination might develop. Prejudice ensues from a denial of the opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them. [Citations.] To say that prejudice can be established only by showing that the cross-examination, if pursued, would necessarily have brought out facts tending to discredit the testimony in chief, is to deny a substantial right and withdraw one of the safeguards essential to a fair trial. [Citations.]" (*Alford v. United States* (1931) 282 U.S. 687, 691-692.)

10

Wilshire sought cross-examination multiple times during the second day, it never happened.

Mid-Wilshire explicitly sought to cross-examine Richards regarding the assignment to D-Day at least twice during the November 20 proceeding. The discussion moved on to other topics, and cross-examination was never afforded.

The Richards declaration was the only admitted "evidence" before the trial court regarding the purported oral assignment from Dr. Leevil to D-Day of the debt secured by the second trust deed, and the court never addressed it in any way, leaving us unable to determine how to interpret it.

## II.        Debt

As to the existence of debt, the trial court made the following findings of fact: "At the time of the foreclosure sale of the Tustin Property, there was a debt owed by Mid-Wilshire LP on the Mid-Wilshire Note. [Stipulated Facts Nos. 39-42, 49] [Exhibits 5, 71, 74, 99, 115.] [¶] [] Prior to the foreclosure sale of the Tustin Property, Mid-Wilshire LP never tendered the full amount due and owing on the Mid-Wilshire Note. [Stipulated Facts Nos. 39-42, 49] [Exhibits 5, 71, 74, 99, 115]."

The stipulated facts to which the court refers are the following:

"39.  On March 26, 2015, D-Day Capital, LLC submitted a $4,811,331.35 claim to the surplus proceeds from the February 19, 2015 foreclosure sale of the Westlake Property . . . . [Exh. 071-01]

"40.  On March 30, 2015, D-Day Capital, LLC submitted $4,760,657.08 revised claim to the surplus proceeds from the February 19, 2015 foreclosure sale of the Westlake Property.  (Exh. 074-01)

"41.  The foreclosure trustee did not agree to pay all of the amounts claimed by D-Day Capital, LLC in its revised claim.

11

"42. On April 1, 2015, the foreclosure trustee paid D-Day Capital, LLC $4,747,135.28 from the surplus proceeds from the February 19, 2015 foreclosure sale of the Westlake Property. (Exh. 099-01) [¶] . . . [¶]

"49. On July 1, 2015, Dr. Leevil, LLC directed the foreclosing trustee to proceed with the foreclosure sale of the Tustin Property with an opening bid of $226,032.14." (Exh. 115-01)

As can be seen from the above, the existence of debt was *not* a stipulated fact. All that was stipulated was that the trustee of the Westlake foreclosure sale did not give D-Day everything it asked for.

There was no stipulation – and certainly no testimony – that the trustee had correctly calculated any of the amounts in question. The most probable source of the numbers used by the trustee is Dr. Leevil. If the trustee made his own calculations, then he should have been on the witness stand explaining how he arrived at them.

Of the exhibits cited by the court, the only exhibits admitted into evidence were exhibit 5, the trustee's deed on sale, cited in none of the stipulated facts, and exhibit 71, the surplus proceeds claim form dated March 26, 2015, referred to in stipulated fact no. 39. The other exhibits were not admitted, although the stipulated facts referred to them.

Exhibit 124, which was admitted into evidence, gave Dr. Leevil's estimate of the amount due as April 1, 2015 – $105,594.65. Exhibit 126, also admitted into evidence, gave the amount Dr. Leevil claimed was owing as of July 22, 2015, the date of the sale to Lido – $226,032.14. Dr. Leevil argued that these numbers represented interest and attorney fees that were continuing to accumulate after the Westlake foreclosure sale in February 2015 and were therefore unpaid out of the surplus from the Westlake foreclosure sale. They represented the debt upon which the Tustin foreclosure was based.

Again there was no testimony regarding the accuracy of these figures or regarding the effect of the maturity late fees – *the propriety of which was on appeal from*

*the Ventura judgment* – on the amounts claimed. The best that can be said of these exhibits is that they represent Dr. Leevil's side of the dispute. Again, Mid-Wilshire asked to cross-examine Richards on how he arrived at the unpaid balance Dr. Leevil claimed was still owing after the Tustin foreclosure sale. Again, the court failed to afford that opportunity. As the court had recognized in August 2017, Mid-Wilshire had its own take on interest charges and attorney fees, in addition to the dispute over the maturity late fee. These differences were never explored through sworn testimony, and cross-examination was denied on the stipulations.

Ordinarily we would apply the usual appellate tests regarding burdens of proof, intendments, and presumptions, but this record precludes that; instead we must simply conclude that the trial court's conclusions on the two issues remaining between Mid-Wilshire and Dr. Leevil – standing and the existence of debt – do not rest on substantial evidence.

Dr. Leevil argues that the recoupment of the maturity late fee is the subject of a motion for summary judgment filed in Los Angeles Superior Court on February 11, 2021. It characterizes this motion to mean that Westlake is claiming the right to *both* maturity late fees – the one imposed on the Westlake debt and the one imposed on the Mid-Wilshire debt – and therefore Mid-Wilshire has no claim to a credit for any overpayment of its late fee.

It is certainly true that Mid-Wilshire cannot receive credit for the same fee twice. But the improperly imposed maturity late fee may not be the only type of damages at issue. Mid-Wilshire may have evidence of other kinds of damages attributable to wrongful foreclosure. This is another element of a proper trial that we cannot discern on this record.

The final issue is the effect of Mid-Wilshire's settlement with Lido, the entity that purchased Mid-Wilshire's property at the trustee's sale. Dr. Leevil has moved

13

to dismiss the entire appeal on the ground that Lido is an indispensable party to the action. Settling with Lido, it asserts, nullifies the entire appeal.

It is true that Lido is an indispensable party to causes of action to set aside the trustee's sale and to cancel the deed on sale, as well as the cause of action for quiet title. (See Code Civ. Proc., § 389, subd. (a).) Accordingly these causes of action cannot go forward in its absence. Lido is not, however, an indispensable party to a tort cause of action for wrongful foreclosure. This cause of action seeks nothing from Lido; Dr. Leevil is the sole named defendant. The remedy is damages, not the return of the property. The motion to dismiss is denied.

## DISPOSITION

The judgment is reversed. The matter is returned to the trial court for the dismissal of Lido Holding Company, LLC, pursuant to the settlement agreement with appellants and the dismissal of causes of action in which Lido Holding Company is an indispensable party. The cause of action for wrongful foreclosure is to be resolved in accordance with the Code of Civil Procedure and the Evidence Code. Respondent Dr. Leevil's motion to dismiss is denied. Respondent's request for judicial notice is denied. Appellants' request for judicial notice is granted to the extent explained in the opinion. The parties are to bear their own costs on appeal.


BEDSWORTH, J.

WE CONCUR:


O'LEARY, P. J.


GOETHALS, J.

14